OPINION OF THE COURT
Michael F. Mullen, J.
This court held a multifaceted pretrial hearing on December 7, 1988, and several issues were raised, including an assertion that the People should be precluded from offering defendant’s alleged oral statements because they failed to comply with CPL 710.30. In order to decide that issue, a brief review of the facts is essential.
The first witness called by the People was Detective Nor *77 man Rein of the Homicide Squad. He testified that on (Saturday) June 25, 1988 at 3:42 a.m., he received a phone call notifying him that a homicide had taken place at the Pine Hills Condominium and Golf Course complex, in Manorville. Rein went there and met another homicide detective, James McCready. After being briefed by uniformed police, Rein heard a radio transmission, which, in essence, indicated that a subject named Patrick Schoendorf was in custody at the entrance to the Pine Hills complex. Rein and McCready drove to where Schoendorf (defendant) was being held, and Rein advised him of his constitutional rights by reading them from a printed card. Defendant was then placed in a police car, and Rein asked his name and address. In response to further questions by Rein, defendant gave his wife’s name and date of birth. He then stated "Something has happened to her,” referring to his wife. At that point, Rein told defendant that he was right, something had happened to his wife, and he (defendant) was under arrest. They then went to police headquarters in Yaphank, with Rein sitting in the back seat with the defendant, while McCready drove. During the 15-minute ride, defendant and Rein had an extended conversation, in which defendant indicated, inter alia, that he had an argument with his wife "last night” (meaning Thursday), that he hadn’t been home all night (Friday), but had been out with his friend, Eric Swenson, drinking and "four-wheeling” in his truck. Upon arriving at headquarters at 5:15 a.m., defendant, Rein and McCready went to an interview room. Defendant’s handcuffs were removed, and he was readvised of his constitutional rights, using the same card Rein had used earlier, only this time defendant dated and initialed the card. Defendant was then questioned about where he had been during the previous 12 hours or more. According to Rein, defendant’s response to these questions was lengthy and detailed.
There came a point when defendant was asked what he meant when he had said, when originally stopped, "I have to see my wife. I have a sneaky suspicion something’s happened to her.” The detectives told defendant he had "a guilty conscience”, and that he knew very well what he had done to his wife. But defendant insisted he was not involved, and was not responsible for whatever happened to her. He would never murder his wife.
Between 9:15 and 9:30 a.m., McCready left to interview defendant’s friend, Swenson. He returned with a written statement from Swenson at about 11:30 a.m. The statement *78 was shown to defendant. Also at about this time, defendant was advised that the FDR test was positive and that the results proved he shot the gun used in his wife’s murder. Upon receiving that information, defendant said, "You’ll have to do more. You will have to prove it to me more than just that alone.” Next, Rein and McCready were relieved by Detectives Carmody and Pfalzgraf, who began their questioning at approximately 1:35 p.m.
Detective Michael Carmody testified that he and his partner, Detective Pfalzgraf, began questioning defendant at about 1:35 p.m. After introducing themselves, Pfalzgraf and Carmody asked defendant about his background and the relationship he had with his wife. Carmody indicated during this conversation that sometimes people are killed for various reasons and that "We don’t mean for them to happen. They just happen. After it happens, we are sorry that these things have occurred.” Defendant then, according to Carmody, began to cry and orally confessed to his wife’s murder. Later, at 4:10 p.m., defendant gave a written confession.
In deciding whether to preclude use of defendant’s alleged oral statements, it is necessary to closely examine CPL 710.30 and recent cases which have sought to interpret it. Section 710.30 reads in pertinent part as follows:
"1. Whenever the people intend to offer at a trial (a) evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible upon motion pursuant to subdivision three of section 710.20 * * * they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.
"2. Such notice must be served within fifteen days after arraignment and before trial, and upon such service the defendant must be accorded reasonable opportunity to move before trial, pursuant to subdivision one of section 710.40, to suppress the specified evidence. For good cause shown, however, the court may permit the people to serve such notice thereafter and in such case it must accord the defendant reasonable opportunity thereafter to make a suppression motion.
"3. In the absence of service of notice upon a defendant as prescribed in this section, no evidence of a kind specified in subdivision one may be received against him upon trial unless he has, despite the lack of such notice, moved to suppress such *79 evidence and such motion has been denied and the evidence thereby rendered admissible as prescribed in subdivision two of section 710.70.”
At bar, defendant made clear that his request to suppress his written statement on grounds of involuntariness was not to be considered a waiver of his right to seek preclusion of his other statements on the grounds the People failed to comply with CPL 710.30. Defendant contends there was such a failure here. The People contend they complied with the statute. What happened was the following:
Defendant was arraigned before the Honorable Louis Ohlig in District Court on June 26, 1988, at which time the Assistant District Attorney served a notice upon defendant’s attorney, and declared his intention to introduce proof of statements made by defendant at trial. This notice was a preprinted form* and did not specify the content of defendant’s alleged statements.
During the arraignment, in response to a bail application, the prosecutor alluded to defendant’s alleged admissions, as follows:
"Your honor, this murder charge stems from an incident that took place early Saturday morning. The defendant returned home at approximately 1:30 in the morning Saturday. He had an argument with the deceased in this case which is his wife. This is according to the statement made by the Defendant to the Homicide Squad that his wife threatened to leave him, ran outside. This defendant then chased after her with a shotgun that they kept in the apartment at Pine Hills Country Club.
"He chased after her, and when she fell down on to the ground he poked her with the shotgun, after that he shot her. He also indicated, Your Honor, to the Homicide detectives that his wife was not immediately killed, but that in fact asked him to get an ambulance, he didn’t do that. He left the scene leaving his wife to die there. At the time there were three (3) young children in the apartment he was living in.
"This individual then returned to the Pine Hills Country Club at approximately 5:00 o’clock in the morning inquiring about what had happened to his wife. He was questioned by Detectives who indicated that he then gave a story about an *80 alibi that he had been out all night drinking. After his alibi fell through and after a witness was interviewed this Defendant then made an oral and written confession to the Homicide Squad Detectives.” (Emphasis added.)
Subsequently, defendant was indicted and arraigned before this court on July 7, 1988. Again, in opposing defendant’s bail application, the Assistant District Attorney stated: "He chased after her with the shotgun. It was loaded. He makes a statement to the police that he ended up poking the deceased with the shotgun. The gun went off and then his wife was on the golf course at that time and still alive and pleading with him to get help” (emphasis added).
The People argue, in essence, that they satisfied the statute by serving a copy of the notice at arraignment and by reciting on the record the details of defendant’s statement. In other words, they contend the requirements of timely notice and specificity were both satisfied.
CPL 710.30 has been recently examined by two Judges in this county. In both People v Solomon (NYLJ, Oct. 11, 1988, at 27, col 2) and People v Pierce (NYLJ, Feb. 27, 1989, at 35, col 6), CPL 710.30 has been construed to require the People to not only notify a defendant within 15 days of arraignment that incriminating statements might be introduced at trial, but also to specify the nature of those statements. In Solomon, the People contended that CPL 710.30 did not require an identification of the statement to be offered at trial, but Judge Harvey Sherman held otherwise. He concluded that the notice of intent must, at a minimum, indicate: "the type of statements to be offered, i.e., that oral, written and videotaped statements were intended to be offered, and the circumstances under which such statements were made. * * * In addition, the sum and substance of the statements should have been set forth and, while a verbatim account of the oral statement is not required, that part of the oral statement which was not contained in the written and videotaped statements should have been disclosed” (supra, at 27, col 3).
Judge Denis Hurley, in Pierce (supra, at 35, col 6), amplified the People’s obligations by requiring that "notice of intent to use an incriminating statement made by a defendant to a public servant as trial evidence, must be accompanied by a detailed identification of the statement involved.” In Pierce, the. People conceded that they failed to specify the evidence intended to be offered when they served their notice.
*81 In both Solomon and Pierce (supra), my colleagues were seeking to square the fact patterns before them with the reasoning set forth by Chief Judge Wachtler in the landmark case of People v O’Doherty (70 NY2d 479). There, speaking for a unanimous court, the Chief Judge stated in part as follows (supra, at 488-489): "Thus, not only considerations of fairness to the defendant, but also concerns for the efficient conduct of criminal prosecutions underlie the Legislature’s directive. The exclusionary sanction for failure to comply contained in CPL 710.30 (3) reflects a judgment that the loss of the use of the evidence is an acceptable price to pay to achieve the desired goals. Although the People complain that the price is too high and the requirements of the statute burdensome, we cannot dilute or disregard the requirements in an effort to avoid exacting the price without trespassing on the Legislature’s domain and undermining the purposes of the statute.”
But at bar, the facts are different from Solomon and Pierce (supra). Here, in addition to "service”, i.e., hand-delivery of the form "notice”, the People, on the record, in open court at arraignment advised defendant and his counsel of the contents of defendant’s statements and the fact that he had given the statements to homicide detectives.
So the question is whether what was done here satisfies the letter and spirit of CPL 710.30. This court concludes yes. One of the goals of CPL 710.30 is "the orderly, swift and efficient determination of pretrial motions” (see, People v O’Doherty, supra, at 488). Since a defendant must make all his pretrial motions within 45 days of arraignment (CPL 255.20), the People must comply with the time restraints of CPL 710.30, otherwise the defendant’s motion will, at best, be delayed, and at worst, be made in the dark. How can a defendant intelligently move (within 45 days) to suppress a statement if he does not know what the statement is, or whether, for that matter, the People intend to rely on it. True, CPL 255.20 (3) gives the court discretion to consider a late pretrial motion upon a showing by the defendant that he could not, with due diligence, have been previously aware or that, for good cause, could not have reasonably raised his contention in time, but this question was not before the court in O’Doherty (supra, at 488) (although it is hard to imagine anyone concluding that untimely compliance with CPL 710.30 by the People does not constitute "good cause”). In any event, at bar, the defendant at arraignment was given notice in writing that the People intended to offer proof of a statement allegedly made by him, *82 and then, in open court, he and his attorney were advised of the details of that statement (see, People v Anderson, 141 Misc 2d 161). While it might be argued that the written notice should include the details, the fact is that under all the circumstances here, the defendant was sufficiently notified, so that he could adequately prepare his pretrial motion (see, People v Grandenetti, 139 Misc 2d 614, 615; cf, People v Ludolph, 63 AD2d 77, 80-81). The purpose of the statute was served.
Accordingly, defendant’s motion to preclude so much of his statement(s) as were specifically placed on the record at, and prior to, his arraignment is denied.
The foregoing constitutes the decision and order of the court.
[Portions of opinion omitted for purposes of publication.]

 The form, insofar as CPL 710.30 is concerned, simply states: "please take notice that upon the trial of the above entitled action, the People will offer proof of a statement made by the Defendant.”